All right. Good afternoon, Council. We're pleased to be proceeding now in the case of Justin Fairfax v. CBS Corporation. Mr. Breckenridge, are you ready to proceed? I am, Your Honor. All right. Thank you. If you would, please do so. Good afternoon, and may it please the Court. I'm Solomon Breckenridge on behalf of Justin Fairfax. CBS did not just report the false allegations of rape and sexual assault against Justin Fairfax. It heavily promoted direct interviews, resurrecting the false allegations two months after they were made, and then doubled down by endorsing them, saying, among other things, it, quote, feels like she was forced. And, quote, all these years later, that pain has stuck with them. As much as CBS wants to make this a grand assault on journalism, CBS is the only defendant here, and its unique behaviors go well beyond establishing a plausible claim that it published false accusations of sexual assault by Mr. Fairfax and endorsed them with actual malice. A reasonable juror certainly could so find on both defamatory material and actual malice. As to defamatory material, the allegations themselves are defamatory per se, and independently, there is no question that a reasonable juror could conclude that the additional statements endorsed the false allegations. And then as to actual malice, the complaint provides no fewer than 12 indicia of actual malice, in addition to the slanted comments the co-hosts made at the end of the two broadcasts. Regarding the eyewitness, CBS even conceded at the hearing below that the eyewitness by itself would be sufficient indication of actual malice to meet the plausibility standard if Fairfax had identified him as such. Given Fairfax's spokesperson walked CBS right up to that door with Damian Blue and Joe Richburg, the 11 other indicia of actual malice have to be enough to meet the pleading burden. And I think that's important to keep in mind. Mr. Breckinridge, are you saying that the CBS reporter lied about being unable to reach the four individuals that Mr. Fairfax's spokesperson suggested that he talk to? Well, no, two things on that, Your Honor. First of all, I'm not saying that he lied, but there are two things on that. First of all, there's just nothing in the records saying whether he lied or whether he told the truth. And second, that was on February 8th. So on February 8th, Fairfax's spokesperson gave him a list of four names. And then on February 8th, he texted back saying, oh, one of these people is a CBS reporter. And then further adding later on, they haven't returned our calls. Please urge them to get in touch. Between February 8th and April 1st, there are almost two months where we have absolutely no idea how much effort was taken to get in touch with these folks. But we know that whatever effort was taken, they did not actually learn the valuable information from them as far as the fact of the eyewitness. And one of those people was one of their own lawyers. So given that, you know, given that timeline where there are these two counts, I think that's a really important factor. Judge Rushing? Yes. We're here on a motion to dismiss. So your point that there's nothing in the record about, you know, what they knew or didn't know seems to maybe cut against you, don't you think? Obviously, you can't know things that you're not privy to about what happened or what didn't happen. But you have to plead actual malice plausibly, which means you have to plead that there was knowledge of falsity or that they were reckless and disregarding falsity. So what do you have on that point? Not just that, you know, there's speculation about what might have happened, but what has been pleaded that they actually knew or were reckless that these allegations were false? Well, Your Honor, there's a list. There's a pretty long list. But first of all, there's the fact that they knew they had Joe Richburg, a CBS lawyer who counsels them on defamation. They knew that he had information and they did not obtain it. Or if they did obtain it, they withheld it. It's got to be one of those two. Number two, they knew that they had these questions that Fairfax's spokesperson suggested that they ask that listed things like, did you see anyone when you walked in the room? Did you see anyone when you leave? They knew that neither of the people that neither of the accusers was willing to participate in criminal investigations, even though at least one and I believe both of them were still within the statute of limitations. They knew that they knew about the issues with Duke and the fact of the assertion by Meredith Watson that she had been raped at Duke and that Duke had challenged. Duke had disagreed or at least stated that it could not find anything in its records to suggest that she had claimed that she had been raped by someone else at Duke. They knew that there were they knew that that despite CBS, despite having easy access to Fairfax's spokesperson, they knew that they weren't making any attempt to let her know that they were doing interviews. They knew that they do. What does that have to do with knowledge of falsity? Well, I think it's evidence of purposeful avoidance of truth. And so far as you know, they have people who know things they've gotten this list of and they don't even try and get information from them. So, for instance, they have got this list of four people from Fairfax's spokesperson. And then two months later, in all that time, they never asked her anything about them. And they you know, in the brief, CBS asserts that somehow it was Fairfax's responsibility to explain exactly what these people's value was to assert to determining the falsity of the allegations. But then in two months, they never actually asked that question. So I think that that's very much. Then are you saying that that's reckless disregard of the truth? Because in order to surmount the actual malice standard, you've got to show reckless disregard. There has to be reasons to think that the the CBS had to have reasons to believe that the information provided by Watson, excuse me, Wilson and Tyson was false, didn't it? And where do you have that in your allegations that CBS had a reason to doubt the veracity of these two women or that the fact that they hadn't talked to these other witnesses created a doubt as to the veracity? Well, your honor, I would disagree with the premise that they have to that there has to be some proof that they that there is some some proof beyond their purposeful avoidance of the truth. There are statements that a failure to investigate alone is not enough to prove actual malice unless there is objective reason to doubt the the accusers. But that doesn't mean that that that evidence is irrelevant. And it certainly doesn't mean that we ignore all the other indicia of actual malice. We have to take all the actual malice together to determine whether or not there is circumstantial evidence, because, of course, we don't have direct evidence at this point in admission by CBS. We haven't even had any discovery to perhaps get that. But there but the question is whether we plausibly played enough circumstantial evidence to to establish that there is that that is at least plausible that they engage in a purposeful avoidance of the truth. And given that all of these indicia of actual malice, all of these things indicate a purposeful avoidance of the truth. Just like in Palin, they indicate that CBS had an agenda given its motive of having had the issues with Les Moonves and Charlie Rose happened and the fact that they needed they needed to show an identity with the Me Too movement. And given given that motivation and then given the fact that this happened and these allegations happened and gave them the opportunity to show to push an agenda showing that they are on the side of the Me Too movement. And then putting putting that together with all of the other indicia that they purposefully avoided the truth. I think it really just it makes an overwhelming case of at least plausibly pleading actual malice. Mr. Bergenridge, you know, I agree with you that the comments that these talk show or morning news made the commentary is really kind of unsettling. I agree with you on that. But, you know, the law says we've got to look at everything. And during the presentations, there was a constant reminder that Mr. Fairfax denies this. You know, if you look at the overall context and this is what Judge Trenga, I think, was saying when you look at the overall presentation, it isn't a totally one sided presentation. It presents the information detrimental about Mr. Fairfax, but also says categorically he denied it. So when you look at the whole picture, you're saying still that their failure to pursue the truth with notwithstanding the whole context that we have to look at gets you over the bar of actual malice. Is that right? Your Honor, because I think that, you know, the reasonable inference of whether or not the inference of whether or not they really did present both sides in a fair way is really a jury question. Once you just once you get past the issue of whether or not any reason of whether a person was reasonably capable of determining that the purportedly two sided presentation was actually two sided. If looking at that presentation, I don't find it two sided at all. I find it very one sided. They give these long segments of interview and then they quickly give Mr. Fairfax's denial and immediately follow that up with their commentary that undermines Mr. Fairfax's denial. I think a juror could be reasonably capable of determining that's defamatory and that going into the quick denial and providing the denial information is a mere fig leaf. So, so, Counselor, Mr. Breckins, this is Judge Quattlebaum. I mean, you know, I mean, I follow up a little bit on Judge Keenan. I mean, I, you know, I can I mean, I can see certainly an isolated comment and you're probably right there. You know, timing wise, it's disproportionate. But, you know, even at a 12B6 stage, I think we have to look at whether a reasonable juror could, you know, if accepted as true, consider that as taking one side. Seems like if this takes one side, you know, we got defamatory statements, the defamation right and left all over the news these days. And maybe we do. Maybe that's that's the point. But I mean, if you're right, we have sweeping defamation and actual malice all over the place, don't we? No, not at all, Your Honor. First of all, I would say that the defamatory material here, like this isn't a case against the other major media outlets who reported this. This is a case against CBS. Now, you noted that that there might be one statement that the straight statement. This isn't a case of one straight statement. This is a case of eight statements that CBS calls off the cuff statements. But there are eight of them after these interviews and there are a minimum of eight. It's more like nine or 10, just depending on how you parse it. And all of them are in favor of the accusers. So this isn't this is not a case. And on top of that, you have to under Virginia law, you have to establish not only that there is defamation, but you also have to establish the mens rea. So, yes, there is defamatory material published all the time by news media outlets. That doesn't mean that there's an actual case for defamation because you have to meet the mens rea requirement under Virginia law. Now, mind you, in this case, the mens rea requirement under Virginia law is irrelevant because it is a little is negligence and we have to meet the actual malice requirement anyway. But in either event, that was one thing that Judge Trang, I think, got pretty wrong, was that Judge Trang brought issues of actual malice and brought them into defamation into whether whether they said anything defamatory. But they but, you know, defamatory material was definitely published here by CBS. CBS acknowledges the common law rule that that is defamatory material at page 30 of its brief. And then it asked this court to create to create new Virginia policy, which I don't think is the role of the court and and create new rules whereby it's not defamatory material. But Virginia already has covered that. Virginia already has made it not not not an option to make all defamatory material like create liability by adding the mens rea requirement. And so, given that, this case really, I think, hinges on whether or not actual malice is plausibly pled. And given that there are 12 in ditch of actual malice listed in the more than that in the complaint, 12 listed in the briefs, you're taking them all together. Just like in Palin, Fairfax has met the bar for plausibly actual malice and, of course, for plausibly pleading the publication of defamatory material. Unless the court has any further questions, I'll reserve the remainder of my time for the bottle. OK, thank you. Let's hear from Mr. Brown. Thank you, Your Honor. Jay Brown for CBS. Broadcasting Incorporated, as the discussion so far suggests, the district court had two independent grounds for granting the motion to dismiss. We believe it should be affirmed on both counts. But let me begin with the one that presents a pure question of law, not an issue of pleading. And I'd like to unpack the unnecessary complications that have been posed on that question. It is firmly established in the precedent of this court and of the Virginia Supreme Court that it is a threshold question of law for the court at the pleading stage. In fact, the Virginia Supreme Court in the Webb case has referred to it as an essential threshold gatekeeping function to determine whether the publication as a whole, giving the ordinary meaning to those words, giving words the meaning that they appear to have been intended to convey, in fact, reasonably capable, that is, whether the archetypal reasonable person would understand the whole publication to convey the defamatory meaning alleged by the plaintiff. The Virginia Citizens Defense League v. Couric case, the court's decision in 2018, makes it very clear that that threshold question, and only if the archetypal reasonable viewer interprets the statement with that defamatory meaning, does there then proceed with the jury the question of whether viewers of the program, actual viewers, in fact interpret it in that way. I'm sorry, I don't have a question. I'm just having difficulty hearing you. I don't know if you can step closer and it'd be better. I apologize. We're all doing our best, so I'm not being critical here, but maybe that'll help getting closer. Certainly. I do apologize, Your Honor. It is not usually my problem to be quiet. Is that better? That's a little better. I think something kind of goes out, but we'll do our best. Thank you. My apologies, and let me know if the court would prefer that I dial in instead. But as I was saying, in the Couric case, this court's 2018 case, and in the Webb case, both of which are cited in the papers, Webb being the Virginia Supreme Court opinion, the court clearly held that this is a question of law, the question of whether the publication is capable of the alleged defamatory meaning. In the Webb case, the Virginia Supreme Court reversed the verdict and said that the trial court should have dismissed at the pleading stage, the demer stage in state court, precisely because the statement there was not reasonably capable of the defamatory meaning alleged. And the facts are quite close here, Your Honor, between Webb and this case. In the Webb case, the plaintiff complained that the newspaper article conveyed the impression that he, the principal, the assistant principal, had arranged special treatment for his child. But as the Virginia Supreme Court pointed out, that same article included an express denial by school officials that there had been any special treatment or interference. And the Virginia Supreme Court had that a reasonable reader, who is charged with reading the entire publication and construing it in the ordinary sense, would not attribute to the newspaper the assertion that the plaintiff assistant principal had, in fact, interfered in the disciplinary process there. And those facts, Your Honor, are closely analogous to the facts here, in which although CBS presented the two women explaining their allegations, it also repeated fully, both on screen in text and through anchor Gail King reading aloud, Fairfax denials of those same allegations. And referred the audience members to the website where Mr. Fairfax's written statement was printed in full. You know, Mr. Brown? Yes. Judge Keenan, you know, it really did make me uncomfortable when I listened to this on how these news people were saying feels like she was forced. I mean, you know, maybe you can say that's a statement of their opinion, but it really left me with an uncomfortable feeling. How they seem to showcase this, you know, kind of a touchy-feely presentation based on what they were thinking, rather than what the news story was. How do you counter that? I mean, what I'm trying to figure out is should this have gone to a jury? You know, this is really pretty atypical for people to talk about whether a victim is so-called victim is forced. But, Your Honor. Kind of outside the typical presentation, isn't it? No, Your Honor, not in the facts of this case. It is important to remember that in this case, this is not a situation in which one or, in this case, two women claim they were sexually assaulted. And the alleged perpetrator's response was, I've never, ever seen that woman before. I've never been in the same room with that woman before. In this case, Mr. Fairfax admits, and both of the women say, that the encounters began as consensual sexual encounters, which in the women's view, at some point became non-consensual. And Mr. Fairfax refused to acknowledge that. And in that context, Your Honor, I think it's perfectly reasonable to read Mr. O'Donnell's comment. You're referring to the DVD Exhibit 3. The transcript is Exhibit 4 at docket 17.5. And the full quote coming before that is one of the anchors saying, you could see where she got very emotional and went to that dark place. And Mr. O'Donnell says, yeah, feels like she was forced. And a reasonable construction of that is that Mr. O'Donnell was simply repeating the statement by Ms. Tyson that she felt forced, that the sex at one point became non-consensual. And Ms. King, in that same exchange, referred to what Ms. Tyson, quote, what she says happened. And so I think in fairness, Your Honor, in the exchange, the comments which are in direct response and follow a tear-filled encounter explanation of what that woman contends are comments on and understood as sympathetic reactions to the emotion being displayed. That's true of the second broadcast as well, in which the anchors talk about how the pain has stuck with them and how they felt in that moment. But nowhere, Your Honor, do any of the anchors, in fact, endorse the notion that the encounter was non-consensual. The anchors do not assert that Mr. Fairfax, in fact, raped or sodomized either woman. And again, Your Honor, having seen the DVD, as I understand you have, you will recall that across the bottom of the screen, while the women are speaking, they are referred to as accusers. It's a graphic that says they are accusers. Mr. Fairfax's statement, you will have seen, was words were quoted in writing on the screen, read by the anchor. And in the Couric and in the Webb cases, both this court and the Virginia Supreme Court said you have to look at all of the elements of the program. You can't isolate the particular segment or particular sentence that the plaintiff complains about. And in both of those cases, because of the material adjacent, and in the Webb case on the closely analogous fact that what was adjacent was a denial by the school that there had been any favoritism, both this court and the Virginia Supreme Court concluded that the archetypal reader would not interpret those as a endorsement by the publisher, in this case the broadcaster, that the sexual attacks, in fact, took place, or put more precisely, did not endorse the proposition that these encounters became nonconsensual, and that Mr. Fairfax acknowledged that. And, Your Honor, it is crucially, I beg the court's pardon, my screen just went blank. There you are, you're back. In this regard, Your Honor, the suggestion that that automatically becomes a theory question, because certain people, Mr. Breckinridge said he would read it that way, simply isn't legally relevant here. In the Webb case itself, several people at trial had testified that they read the statement at issue in Webb in the way that the plaintiff claimed it should be read. And the Virginia Supreme Court, nonetheless, reversed the verdict for the plaintiff, and held that the claim should have been dismissed, because the presence of that denial, reporting of the denial in immediate proximity to the allegedly defamatory statement, rendered it unreasonable as a matter of law for a viewer to interpret it that way. Mr. Brown, I'm not trying to tell you how to do your argument, but I appreciate those comments. I'd like to hear from you on actual malice, and I'd hate for the clock to run too far. So, if you would please address that, make sure you give yourself enough time to address that issue. That's something I want to hear from you all. By all means, Your Honor, I appreciate that and want to be heard on that as well. And I would just conclude the defamatory meaning argument by the observation that the district court did exactly what the binding case law required it to do, and in our view, correctly held that reasonable viewers would not conclude that CBS itself was endorsing the conclusion that Mr. Fairfax raped or sodomized a woman. And actual malice presents an interesting question. And the question is whether the facts, not conclusory allegations, but whether the facts by the plaintiff lead to the reasonable inference. And remembering that the plaintiff's burden of proof on this point is clear and convincing evidence. The reasonable inference in that light that CBS, in fact, doubted the truth of these human stories. That approach and that standard is set out in the Roiber case, which was this court's en banc announcement on this issue. And here, Your Honor, the Horne case is both on the fact and the law. That's Horne versus WTBR. Judge Keenan was a member of the panel in that 2018 case. There, the contention, like here, was that the failure to investigate that case, an anonymous email that disputed the story, was the evidence of actual malice. Because the reporter did not undertake to further investigate the information provided in that anonymous tip. And this court held, following its own prior precedent and precedent of other courts, held that there is no duty to investigate, to follow up on every single conceivable lead, where there is no obvious reason to doubt the primary sources or the other sources of information in this regard. As this court put it in the Horne opinion, quote, failure to investigate every potential lead cannot amount to reckless conduct. And the court in that regard was referring back to an earlier conclusion, Ryan versus Brooks, a 1980 decision of this court, which made exactly the same point. So the threshold question that Mr. Fairfax has to overcome in his pleading on actual malice is to establish that CBS had obvious reason to doubt the two women's stories. And this he cannot do. First of all, he argues broadly that CBS was on notice that the women suffered from credibility. In particular, he focuses on Ms. Watson and the Washington Post's initial story on this, in which this post printed that it had been unable to corroborate her story. Now, we reject the notion that the journalists at CBS are charged with knowledge of anything ever published by anyone. But the problem is that even if you accepted plaintiff's legal theory on this, you should have known the Washington Post said it was uncorroborated. The problem is that a few days later, on February 8, the Post published the articles in the record in the joint appendix that they had found two sources to corroborate Ms. Watson's story. A classmate whose room Ms. Watson went, as the Post reports it, and we're not offering the article for the truth of the matters reported, but in response to Mr. Fairfax's contention that the Washington Post's reporting could have put CBS on notice that the woman had credibility issues. Because the very next news report published by the Washington Post, both named in the article, corroborated the story, one saying that immediately following the rape, Ms. Watson went to this woman's room and told her that she had just been raped by Mr. Fairfax at the time. And then the Post also reports that it was shown an email from 2016 in which, again, a named source quoted in the Post article says that when they sent a fundraising solicitation for Justin Fairfax to Ms. Watson, he responded by email that showed the email in which Ms. Watson says, I was raped by Justin. Please take me off the fundraising for him. So the premise that Mr. Fairfax has adequately alleged that CBS was on notice of obvious reasons to doubt Ms. Watson's story is absolutely applied by his own theory and by what's in the record. And so in fairness, Mr. Fairfax does point to a couple of other things. He points to what he referred to as the CBS attorney and the purported knowledge held by that attorney that Mr. Fairfax argues would have been relevant to his decision whether to proceed with the story. The problem, there are several problems with that theory. First of all, Mr. Fairfax fails entirely to allege any actual link between that attorney and the preparation of his broadcast. And as has been the law of the land since New York Times versus Sullivan, that is an element of proving actual malice is to tie it, tie that state of mind to the persons actually responsible for the broadcast. And all Mr. Fairfax alleges is that lawyer somehow had some responsibility for the defamation at CBS Corporation, not at the broadcasting broadcast, the actual report. That alone eliminates that issue as a plausible basis on which actual malice could be stated. But as Mr. Breckinridge conceded, the plaintiff pleads in paragraph 138 of the amended complaint that they don't know whether or not anyone actually spoke to the CBS attorney, although they can say for certain is that no quotations attributed to him were included in the broadcast. That Mr. Fairfax deliberately, and he has proudly announced in his public statements, which are part of the record and acknowledges in his pleadings, his counsel in the district court conceded that he deliberately withheld and chose not to disclose to CBS at any point until July after this litigation was filed. Why it was worth talking to the CBS lawyer or why it was worth talking to other people on the list of sources, that is because a man named Damian Blue was, according to Mr. Fairfax, present in the room. And according to Mr. Fairfax, Mr. Blue told the CBS lawyer that as he watched the sex act, he felt it was potential. Insofar as the CBS lawyer had that conversation, that's, of course, hearsay. And in addition, Mr. Blue may face potential liability for witnessing if it turned out the woman was correct, that a crime was committed there. So CBS's decision not to include that in the broadcast itself cannot be evidence of actual malice. I see my time is up, Your Honor. And unless there are questions, I'm happy to rest it there. All right. Thank you. Mr. Breckenridge again. Thank you, Your Honor. I'd like to address a few things mentioned by CBS just now. In particular, I wanted to talk a little bit about Horn and then a little bit about Webb. CBS's counsel, my friend on the other side, talked about Horn. And Horn only stands for the proposition that alleging a failure to investigate is not enough to prove actual malice. But, again, we have so many other indicia of actual malice. And the eyewitness issue actually comes up pretty big in this because I believe my friend on the other side misspoke when he said that Mr. Fairfax identified the eyewitness in July after this litigation was filed. This litigation had not been filed. I believe it was filed in November of 2019. And CBS is the only major media outlet that to this day still refuses to update its reporting. Another indication of actual malice. So here we have all these indicia of actual malice, unlike Horn and more like Palin, and actually beyond the indicia of actual malice found in Palin. Also, as to Webb, Webb is actually a great example. And the comparison between Webb and other cases is a really great way to kind of acknowledge this reasonably capable standard, reasonably capable of being interpreted a certain way, which is basically the normal standard for summary judgment. And my friend on the other side uses phrases like the archetypal reasonable viewer would not view it this way, but that's different from what's reasonably capable. And so the court's gatekeeping function, to the extent that it has one under federal law beyond basic plausibility, which would be inappropriate in any event, but regardless, the basic plausibility standard is whether or not a reasonable viewer is capable of viewing things this way. So while my friend on the other side likes to say things like these were just the statements by the co-hosts were just sympathetic reactions to the emotions being displayed. I don't find that to be a plausible explanation of what they were saying when they say feels like it was forced. And then they talk about feelings that have existed for decades, which assumes that they actually had these experiences decades ago, necessarily. But at the very least, even if it is just sympathetic reactions to emotions being displayed in some reasonable viewers mind, potentially, that does not exclude the plausible interpretation, the plausible inference that they were actually endorsing the statements of these women, of the accusers. And so you go to Web and if you compare Web, in Web, the court ruled that it wasn't reasonably capable of being interpreted against the plaintiff because the article made it sound like school administrators, not the plaintiff, had their thumb on the scale. Here, this is all about Mr. Fairfax. I see my time is up, and so I urge you to vacate the decision of the district court. Okay, thank you. Now, the parties have not argued the cross appeal here. Mr. Brown, did you want to ask the court for a couple of minutes in order to make a very brief argument on that? No, Your Honor, we're content to rest on the papers that presents a pure legal question, appropriate standard, and I think it's sufficiently set out in the papers. I would like to correct, as my colleague pointed out, when I said that the complaint was filed in July of 2019, I meant the public announcement of Mr. Blue's identity was made in 2019. My underlying point remains the same. Okay, well, thank you both. Let me see, does Judge Quattlebaum or Judge Rushing, do either judge have any more questions? I do not. Thank you. Okay, well, counsel, the panel would like to thank you for your careful attention to this case and for your argument, which has been very helpful. And at this time, I'll ask the clerk to recess court. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Barbara Milano Keenan, A. Marvin Quattlebaum Jr., Allison J. Rushing